**In re Marindee Kay HARDACRE, Debtor.**

**No. 05–95518–DML–13.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

March 6, 2006.

---

Behrooz P. Vida/Richard L. Venable, Venable & Vida, LLP, Bedford, TX, for Debtor.

Angela D. Allen/John Dee Spicer, North Richland Hills, TX, for Chapter 13 Trustee, Tim Truman.

### MEMORANDUM OPINION

RUSSELL F. NELMS, Bankruptcy Judge.

### I.  *Introduction*

In a case filed under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the debtor filed a plan that provides no return to her unsecured creditors. The chapter 13 trustee urges the court not to confirm the plan, alleging that the debtor has failed to commit to the plan all of her projected disposable income as required by 11 U.S.C. § 1325(b)(1)(B). The trustee argues that in calculating her disposable income, the debtor has taken an impermissible double deduction of mortgage and car loan expenses. The effect of this "double dip" is to reduce the debtor's projected disposable income by approximately $1,000 per month, which, if committed to the plan, would pay the debtor's creditors in full. The debtor does not deny the effect of the "double dip," but argues that 11 U.S.C. § 707(b)(2)(A)(i) ex- pressly permits her to deduct not only her average monthly mortgage and car loan expenses, but certain standard amounts for these categories of expenses as well.

The court rules herein that Congress did not intend to permit chapter 13 debtors to take a double deduction of mortgage and car loan expenses in order to calculate projected disposable income under section 1325(b)(1)(B). Accordingly, the plan as originally submitted is not confirmed.[1]

### II.  *The Means Test and Its Impact Upon Chapter 13 Plans*

On April 20, 2005, President Bush signed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 37 (2005) (the "Act"). As its title suggests, the Act was intended to address what Congress per- ceived to be certain abuses of the bank- ruptcy process. Among the abuses identi- fied by Congress was the easy access to chapter 7 liquidation proceedings by con- sumer debtors who, if required to file un- der chapter 13, could afford to pay some dividend to their unsecured creditors. 151 CONG. REC. S2459, 2469–70 (March 10, 2005).

In order to curb this perceived abuse, Congress substantially modified section 707(b) of the Bankruptcy Code. Under for- mer section 707(b), a court was authorized to dismiss a case under chapter 7 if it found that granting the debtor relief thereunder "would be a substantial abuse of the provisions of [that] chapter." 11 U.S.C. § 707(b). Former section 707(b) did not define substantial abuse, but left it to the courts to define the parameters of abusive filings. The courts of this district

---

1. The court announced findings and conclu- sions on the record at the confirmation hear- ing on January 26, 2006. This memorandum opinion replaces those findings and conclu- sions.

generally weighed substantial abuse under a "totality of the circumstances" test, an important consideration of which was whether a chapter 7 debtor could make substantial payments to her creditors if her case were a case under chapter 13. *See In re Logan,* 2003 Bankr.LEXIS 600 (Bankr.N.D. Tex. June 17, 2003).

Under new section 707(b) the court's discretion has been replaced with a mathematical formula. New section 707(b)(2)(A) instructs the court to presume that abuse exists if the debtor passes (or, depending upon one's point of view, fails to pass) a means test.

Under the means test, the court is to calculate the debtor's current monthly income, reduce that figure by certain living expenses, and then multiply the difference by 60. 11 U.S.C. § 707(b)(2)(A)(i). For the sake of convenience, the court refers to the product of this calculation as "income available for the debtor's creditors."[2] If the income available for the debtor's creditors is greater than $10,000, abuse is presumed. *Id.* If the income available for the debtor's creditors is less than $6,000, abuse is not presumed. *Id.* If the income available for the debtor's creditors is more than $6,000, but less than $10,000, abuse is presumed only if that income exceeds 25% of the debtor's non-priority unsecured claims in the case.[3] *Id.* If the presumption of abuse arises, the court may dismiss the debtor's case or, with the debtor's consent, convert the case to a case under chapter 11 or 13. 11 U.S.C. § 707(b)(1). The debtor can overcome the presumption of

abuse by demonstrating "special circumstances." 11 U.S.C. § 707(b)(2)(B).

In this case, no issue arises as to whether the debtor's filing constitutes an abuse of the bankruptcy process because the debtor, as Congress apparently intended, filed for relief under chapter 13, not chapter 7. Nevertheless, as demonstrated herein, the means test of section 707(b)(2)(A)(i) affects confirmation of the debtor's plan.

Under section 1325(b)(1)(B), if the trustee or an unsecured creditor objects to the debtor's plan, the court may not approve the plan unless the plan provides that all of the debtor's "projected disposable income" during the "applicable commitment period" will be applied to pay unsecured creditors. Section 1325(b)(2) provides that "disposable income" means current monthly income reduced by, among other things, "amounts reasonably necessary to be expended" for the maintenance or support of the debtor or her dependents. In order to determine the "amounts reasonably necessary to be expended" for maintenance or support, section 1325(b)(3) requires the debtor to compare her current monthly income multiplied by 12 (for convenience, referred to herein as "annual income") to the "median family income" for families of a like size who live in the same state as the debtor.

"Median family income" is defined in new section 101(39A). In general, "median family income" is defined as the median family income calculated and reported by the Bureau of Census in the then most recent year. 11 U.S.C. § 101(39A)(A). If

---

**2.** This phrase is not found in the Act. The court avoids use of the term "disposable income" because that term may have different meanings in different contexts. See discussion *infra.*

**3.** Stated differently, if a debtor owes between $24,000 and $40,000 in general unsecured debt, abuse is presumed if the income available for the debtor's creditors is greater than 25% of that general unsecured debt.

the debtor's annual income exceeds the median family income for similarly sized households in her state, then the debtor's expenses must be determined in accordance with the means test in section 707(b)(2). 11 U.S.C. § 1325(b)(3).

The exercise of comparing the debtor's annual income with the Census Bureau's median family income statistics is germane not only to determining whether the debtor must calculate her expenses for plan purposes in accordance with section 707(b)(2), but in determining the "applicable commitment period" for the plan. 11 U.S.C. § 1325(b)(4). The "applicable commitment period" is the term of the debtor's plan. In general, unless the plan provides for payment in full of all unsecured creditors over a shorter period of time, the minimum applicable commitment period is three years. 11 U.S.C. § 1325(b)(4)(A)(i). However, if the debtor's annual income exceeds the applicable median family income for similarly sized households in the same state, then the applicable commitment period is not less than five years unless the debtor can pay her creditors in full in a shorter time. 11 U.S.C. § 1325(b)(4)(A)(ii).

Once the debtor has determined her applicable commitment period and whether she must calculate her expenses in accordance with the means test in section 707(b)(2), she must submit a plan that commits her "projected disposable income" during the applicable commitment period. 11 U.S.C. § 1325(b)(1). Unfortunately, the phrase "projected disposable income" is subject to conflicting interpretations. Section 1325(b)(2) defines "disposable income" as "current monthly income" less various categories of expenses. However, "current monthly income" is defined as the debtor's average income for the six months prior to her petition in bankruptcy. 11 U.S.C. § 101(10A).

Section 1325(b)(1)(B)'s use of the phrase "projected disposable income" raises the question of whether the calculation of disposable income for plan purposes should be based upon the debtor's average income for the six months prior to bankruptcy, or the debtor's projected income based upon her financial circumstances on the "effective date of the plan." In many cases, the answer will yield no difference; the debtor's projected income will be the same as her "current monthly income." However, a strict application of section 101(10A)'s definition of "current monthly income" can have serious consequence in some cases. For example, if "current monthly income" as defined in section 101(10A) applies, a debtor who anticipates a significant enhancement of future income is provided strong incentive to file chapter 13 as soon as possible. The amount of money that she would be required to commit to the plan would be based upon her lower average income prior to filing. On the other hand, a debtor who finds herself in the unfortunate circumstance of having a lower income after filing her petition might find that she is unable to confirm a plan because she cannot devote to the plan a "projected disposable income" predicated upon her prepetition income.

■ The court believes that the term "projected disposable income" must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income. This conclusion is buttressed not only by the anomalous results that could occur by strictly adhering to section 101(10A)'s definition of "current monthly income," but because, taken as a whole, section 1325(b)(1) commands such a construction.

First, section 1325(b)(1)(B)'s use of the phrase "projected disposable income" rather than "disposable income" is instructive. The court is to presume that "Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another...." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1993). While Congress could have used the phrase "disposable income" in section 1325(b)(1)(B) and thereby invoked its definition as set forth in section 1325(b)(2), it chose not to do so. Consequently, Congress must have intended "projected disposable income" to be different than "disposable income."

Next, section 1325(b)(1)(B) refers to the projected disposable income "*to be received in the applicable commitment period.*" (Emphasis supplied). If Congress had intended that projected disposable income for plan purposes be based solely on prepetition average income, this language would be superfluous. This suggests that Congress intended to refer to the income actually to be received by the debtor during the commitment period, rather than prepetition average income.

Finally, section 1325(b)(1) requires the court to determine whether a debtor is committing all of her projected disposable income "as of the effective date of the plan." 11 U.S.C. § 1325(b)(1). This language suggests that the debtor's income "as of the effective date of the plan" is the one that is relevant to the calculation of "projected disposable income," not her income prior to filing. Consequently, "projected disposable income" under section 1325(b)(1)(B) necessarily refers to income that the debtor reasonably expects to receive during the term of her plan.

This does not mean that section 101(10A)'s definition of current monthly income is irrelevant to the calculation of projected disposable income. Section 101(10A) continues to apply inasmuch as it describes the sources of revenue that constitute income, as well as those that do not. 11 U.S.C. § 101(10A).

## III. *The Internal Revenue Service's Standard Allowances*

In arriving at projected disposable income for a debtor above the applicable median family income benchmark, section 707(b)(2)(A)(ii)(I) permits the debtor to deduct certain standard expense allowances that have been developed by the Internal Revenue Service. These standard expense allowances are found at *www.usdoj.gov/ust/eo/bapcpa/meanstesting.htm.* According to the Internal Revenue Service, these standards are used to determine a taxpayer's ability to pay a delinquent tax. Internal Revenue Service Collection Financial Standards, *www.irs.gov/individuals/article/0,,id=96543,00.html.*

The Internal Revenue Service has developed two broad categories of standard deductions. The "National Standards" reflect amounts that are deemed to be reasonable expenditures for five categories of expenses: food, housekeeping supplies, apparel and services, personal care products and services, and miscellaneous expenses. The National Standards apply uniformly to debtors throughout the country except for those living in Hawaii and Alaska. A debtor's deduction under the National Standards will vary depending upon her income and the number of people in her household.

The Internal Revenue Service also has established Local Standards for transportation and housing costs. Transportation costs are divided into two categories for

car owners: ownership costs and operating costs. The ownership cost standards provide maximum allowances for the lease or purchase of up to two vehicles by a debtor whereas the operating cost standards reflect amounts deemed reasonably necessary to operate up to two cars. *Id.* If a debtor has a car payment, she is entitled to deduct both the standard ownership costs and the standard operating costs. *Id.* Ownership costs are fixed on a national basis at $475 for the first car, and $338 for the second car.[4] The standard deduction for operating costs depends upon the region and city of the taxpayer's residence. In the Dallas/Fort Worth region, a debtor is permitted to deduct $425 per month for two cars as operating costs.

The Local Standards also include standard expense allowances for housing and utilities. These standard allowances are determined by the county of the debtor's residence. In the case of a Tarrant County resident with a family of four or more people, the standard allowance for housing and utility expenses is $1,483 per month, of which $1,021 is attributable to rent or a mortgage, and $462 is attributable to other housing expenses.

## IV. *Section 707(b)(2)(A)(iii)*

Authorized deductions for home and car ownership expenses are not found only in clause (ii)(I) of section 707(b)(2)(A), but also in clause (iii) of that section. There, the debtor is permitted to deduct her average monthly payments on account of secured debts. 11 U.S.C. § 707(b)(2)(A)(iii). In general, "average monthly payments on account of secured debts" are calculated by (1) adding (a) the amounts that are "contractually due" to secured creditors

during the 60 months following the petition and (b) any additional payments due to secured creditors in order for the debtor to maintain possession of her home or car (in essence, prepetition arrearages on secured debts), and then (2) dividing the foregoing sum by 60.

## V. *The Debtor's Assertion of the Double Deduction*

■ In this case, the debtor, who is above the applicable median family income benchmark, deducted the amounts permitted under the National Standards and Local Standards from her monthly income in order to calculate her projected disposable income. Among other things, she deducted the $1,021 standard mortgage expense and the $475 standard car ownership expense. However, the debtor also deducted the average monthly mortgage payment on her home, $953.08, and the average monthly payment on a car, $346.16.

The debtor argues that her methodology not only is authorized, but is required by the plain language of section 707(b)(2)(A)(i). Section 707(b)(2)(A)(i) instructs the court to reduce the debtor's current monthly income by the expenses set forth in clause (ii) (the National Standards, the Local Standards and other expenses), clause (iii) (average monthly payments on secured debts), and clause (iv) (average monthly payments on priority claims). The debtor argues that by using the conjunction "and" in section 707(b)(2)(A)(i), Congress clearly intended for debtors to deduct expenses under each of these clauses, even if some categories of expenses (in this case mortgage and car ownership expenses) overlap each other.

The trustee argues that the plain language of section 707(b)(2)(A)(ii)(I) compels

---

4. The allowances under the National and Local Standards are adjusted periodically. The standard allowances reflected in this opinion are those in effect as of the dates relevant to the facts of this case.

a different result. The trustee does not dispute the debtor's assertion that she is entitled to allowances under clauses (ii), (iii), and (iv) of section 707(B)(2)(A), but contends that the debtor must reduce her allowances for mortgage and car ownership costs under the Local Standards by her average monthly payments to secured creditors on account of those items. This result is mandated, according to the trustee, by the "plain" language of section 707(b)(2)(A)(ii)(I) which states: "Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payment for debts."

The court agrees that the resolution of the present dispute turns on the interpretation of the foregoing sentence, which the court refers to as "the 'notwithstanding' sentence". Unfortunately, the meaning of the sentence is anything but plain. For example, what does "shall not include" mean? And, which debt payments are not to be included?

■ Statutory construction is a holistic endeavor. *United Sav. Ass'n. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme. *Id.* For example, if one of the permissible meanings of an ambiguous provision produces a substantive effect that is compatible with the rest of the law, the provision's meaning may be clarified. *Id.*

Additionally, it is well established that the plain meaning of a statute should be conclusive except in those cases where "the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S.

235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). If the court is permitted to avoid the plain meaning of a statute under such circumstances, then surely it is free to reject a construction that is "demonstrably at odds with the intentions of the drafters" in cases in where the statute is ambiguous.

Congress's intent with respect to the means test is well known to even the most casual bankruptcy practitioner. The means test was intended to "ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so." 151 Cong. Rec. S2470 (March 10, 2005).

Given this guidance on statutory construction and legislative intent, the court examines the "notwithstanding" sentence. Initially, the phrase "Notwithstanding any other provision of this clause" informs the court that the "notwithstanding" sentence qualifies or modifies the first two sentences in section 707(b)(2)(A)(ii)(I). In the context of the present dispute, the "notwithstanding" sentence can be paraphrased to read, "Notwithstanding the debtor's ability to deduct the expense amounts allowed by the Local Standards, such monthly expense allowances shall not include any payments for debts."

The phrase "shall not include" is amenable to either one of two constructions. First, it could mean that in calculating the monthly expense deductions under the Local Standards the court should disregard any payments for debts, notwithstanding anything to the contrary under the Local Standards. This construction would be consistent with the debtor's position.

The problem with this construction is that it renders the "notwithstanding" sentence completely superfluous. The Local Standards are not predicated upon the ac-

tual debts paid by the debtor. Instead, the Local Standards are predicated upon amounts deemed to be reasonably necessary for housing and transportation expenses regardless of the debtor's actual expenses. Accordingly, this construction does nothing more than instruct the court to disregard certain actual expense payments that are not included in the Local Standards in any event. If the court were to adopt this interpretation, it would transcend the rule of construction that requires the court to presume that the language in question has meaning. *BFP v. Resolution Trust Corp.*, 511 U.S. at 537, 114 S.Ct. 1757.

An alternative construction of the "notwithstanding" sentence is to view it as an instruction to reduce the expense allowances specified in the Local Standards by payments for debts. However, this construction raises the question of which debt payments reduce the allowances under the Local Standards. After all, the Bankruptcy Code's definition of "debt" is so broad that an unqualified reading of that term would sow significant confusion. *See* 11 U.S.C. § 101(12) ("The term 'debt' means liability on a claim.").

Initially, the phrase "payments for debts" cannot mean payments on all debts prior to the debtor's petition in bankruptcy. Not only would this definition be unlimited as to the scope of debts covered, but it would be unlimited as to time, raising the question of how far back the court must go to calculate "payments for debts." Moreover, if all prepetition debt payments could reduce deductions under the Local Standards, then debtors are encouraged not to pay debts prepetition, a result antithetical to the Act's purpose.

Second, the phrase "payments for debts" cannot mean all payments on debts made by the debtor after her petition in bankruptcy because the very purpose of the means test under sections 707(b)(2)(A)(i) and 1325(b)(1) is to determine the amount of money available to pay unsecured creditors under the plan. It would be circular logic to compel deduction of the very figure that the calculation is intended to produce.

Because the Local Standards are issued by the Internal Revenue Service, it is instructive to refer to publications of that organization for guidance as to the types of "debt payments" that can reduce allowances under the Local Standards. In its Collection Financial Standards and the Internal Revenue Manual, the Internal Revenue Service leaves no doubt on this issue. There, the Internal Revenue Service makes clear that when considering allowances for housing and transportation, the taxpayer is allowed the amount provided by the Local Standards or "the amount actually spent." Collection Financial Standards, *www.irs.gov/individuals/article/0,,id=96543,00.html*; Internal Revenue Manual § 5.15.1.7(4) (May 1, 2004). Thus, these sources inform the court that "debts" as used in the "notwithstanding" sentence must necessarily refer to secured debts related to mortgage and car ownership expenses as provided in section 707(b)(2)(A)(iii).

This logically follows for another reason. Secured debts on homes and autos are the types of "payments for debts" that must be addressed in a debtor's plan if she intends to keep those items. *See* 11 U.S.C. § 1325(a)(5)(B), (9). This is in contrast to unsecured debts, which may or may not be paid pursuant to the plan depending upon the debtor's circumstances.

Accordingly, the court interprets the phrase "payments for debts" to mean pay-

ments on secured debts related to mortgage and car ownership expenses. When so construed, the "notwithstanding" sentence instructs the court to reduce the debtor's deductions for mortgage and car ownership expenses under the Local Standards by the average monthly expenses for those items under section 707(b)(2)(A)(iii).

While this construction eliminates the double deduction of mortgage and car ownership expenses, it also raises a question as to whether the debtor can claim the greater or must take the lesser of the deductions allowed by the Local Standards or the debtor's average monthly secured debt payments. For example, if the debtor's average monthly mortgage payment is $1,500, and the allowance for the mortgage expense under the Local Standards is $1,021, does the debtor receive the benefit of the $1,500 deduction or is she limited to $1,021?

The effect of section 707(b)(2)(A)(ii)(I) is to permit the debtor to deduct the greater of her actual mortgage and car ownership payments or the amounts provided in the Local Standards. This is because the "notwithstanding" sentence cannot be read to require the court to reduce the allowance under the applicable Local Standard to a number that is less than zero, which the court would have to do in order for the

debtor's deduction to be limited to the lesser of the amounts permitted under the Local Standards or the debtor's average monthly secured debt payments.[5] While the "shall not include" language in that sentence can be viewed as an instruction to reduce the applicable Local Standards to zero after deducting the average monthly mortgage and car ownership payments, it cannot be read to create a net negative allowance for those items under the Local Standards.

Thus, the answer to the question posed above is that the debtor would receive the benefit of the $1,500 deduction for mortgage expense. Under section 707(b)(2)(A)'s protocol, the allowance for mortgage expense under the Local Standards, $1,021, would be fully reduced by the average monthly mortgage payment of $1,500. This would leave a mortgage expense deduction under section 707(b)(2)(A)(ii)(I) in the amount of zero. However, the debtor would deduct the full $1,500 average monthly mortgage payment under section 707(b)(2)(A)(iii). Conversely, a debtor with an average monthly mortgage payment of $1,000 would be entitled to a total deduction of $1,021. The debtor would deduct $21 under clause (ii)(I) ($1,021 minus $1,000) and $1,000 under clause (iii).[6]

The construction adopted by the court has the salutary benefit of leading to a

5. The court's analysis is illustrated by the following example. Debtor A has an average monthly mortgage expense of $1,500. The standard allowance for mortgage expense under the Local Standards is $1,021. If the court were to determine that the debtor's mortgage deduction was capped at $1,021, the debtor's deduction under section 707(b)(2)(A)(ii)(I) would be minus $479 ($1,021 minus $1,500). The debtor's deduction under section 707(b)(2)(A)(iii) would be $1,500. After netting the amount in clause (ii)(I) (minus $479) against the amount in clause (iii) ($1,500), the debtor's total mortgage expense deduction would be $1,021, the

amount of the Local Standard allowance for mortgage expense.

6. The court's conclusion that the debtor is permitted to deduct the greater of her average monthly mortgage and car loan payments or the allowances provided in the Local Standards differs from the result that would occur under the Collection Financial Standards and the Internal Revenue Manual. In assessing a non-bankrupt taxpayer's ability to pay a delinquent tax liability, the Internal Revenue Service permits the debtor to deduct the amounts permitted by the Local Standards or the amount actually spent, "whichever is less."

substantive effect that is compatible with the intent of the Act, whereas the debtor's proposed construction does not. Under the debtor's proposed methodology, her unsecured creditors will receive nothing under her plan because, by failing to reduce her allowances under the Local Standards by her average monthly mortgage and car ownership payments, the debtor will have a projected disposable income of zero. Under the construction adopted by the court, however, the debtor will have a projected disposable income in excess of $1,000 per month, which, if applied to the debtor's plan, would be more than enough to pay her creditors in full.[7]

When section 707(b)(2)(A)(ii)(I) is construed in accordance with the foregoing analysis, section 707(b)(2)(A)(i) is placed in its proper context. Although the debtor is correct when she asserts that clause (i) requires the court to deduct all categories of expenses under clauses (ii), (iii) and (iv), her argument is vitiated by the requirement in clause (ii)(I) that the debtor reduce her allowances under the Local Standards by average monthly payments on secured debts related to mortgage and car ownership expenses.

### VI. *The Debtor's Deduction of Ownership Costs on a Car Not Subject to a Secured Claim*

■ Shortly before the confirmation hearing, the debtor amended her calculation of disposable income to claim a deduction under the Local Standards for a sec-

ond car even though it was not subject to a note and lien or a lease agreement. The Collection Financial Standards prohibit the deduction claimed by the debtor. The standards expressly state, "The ownership costs provide maximum allowances for the *lease* or *purchase* of up to two automobiles if allowed as a necessary expense." Collection Financial Standards, *www.i rs.gov/individuals/arti- cles/0,,id=96543,00.html* (emphasis supplied). Because the Local Standards only provide for a deduction for automobiles that are subject to lease or purchase, they do not permit a debtor to claim an ownership deduction for a vehicle owned free and clear by the debtor.

### VII. *Conclusion*

For the reasons stated herein, the debtor's plan is not confirmed. The debtor's plan will be confirmed if she amends her plan to (1) reduce her section 707(b)(2)(A)(ii)(I) mortgage expense by $953.08 (her average monthly mortgage payment),[8] (2) reduce her section 707(b)(2)(A)(ii)(I) first vehicle ownership expense by $346.16 (her average monthly car payment)[9], and (3) delete her section 707(b)(2)(A)(ii)(I) second vehicle ownership expense in the amount of $338.00 (due to unauthorized deduction).

IT IS SO ORDERED.

---

Collection Financial Standards, *www.irs.gov/individuals/arti- cle/0,,id=96543,00.html;* Internal Revenue Manual § 5.15.1.7(4) (May 1, 2004). Congress did not resolve the choice so explicitly under the Act. Instead, Congress created a mathematical protocol wherein the standard expenses under clause (ii)(I) are to be reduced by actual payments under clause (iii). The result is to eliminate the "double dip," but also to allow debtors a more generous deduction of mortgage and car ownership expenses

than permitted by the Internal Revenue Service.

7. The claims of debtor's unsecured creditors are approximately $28,000.

8. The debtor may deduct the $953.08 under section 707(b)(2)(A)(iii).

9. The debtor may deduct the $346.16 under section 707(b)(2)(A)(iii).