**In re Jason Robert NASLUND, and Janice Elaine Naslund, Debtors.**

**No. 06–60428–13.**

United States Bankruptcy Court, D. Montana.

Nov. 16, 2006.

Richard A. Ramler, Belgrade, MT, for Debtors.

### MEMORANDUM of DECISION

RALPH B. KIRSCHER, Bankruptcy Judge.

At Butte in said District this 16th day of November, 2006.

In this Chapter 13 bankruptcy, after due notice, a hearing was held August 1, 2006,

in Butte on confirmation of Debtors' First Amended Chapter 13 Plan ("Plan") filed July 11, 2006. Attorney Richard A. Ramler, of Belgrade, Montana, appeared at the hearing on behalf of Debtors and in support of confirmation of Debtors' Plan. The Chapter 13 Trustee, Robert G. Drummond, of Great Falls, Montana, also appeared at the hearing, as did attorney Craig D. Martinson, of Billings, Montana, on behalf of objecting creditor MBNA America Bank, N.A. ("MBNA"). No exhibits were offered into evidence, but Debtor Janice Elaine Naslund ("Janice") testified. At the conclusion of the hearing, the Court granted the parties time to file simultaneous briefs, which have been filed and reviewed by the Court. This matter is now ready for decision and this Memorandum of Decision sets forth the Court's findings of fact and conclusions of law. For the reasons set forth below, the Trustee's and MBNA's objections to confirmation of Debtors' Plan are overruled, and confirmation of Debtors' Plan shall be denied by separate Order, so Debtors may amend their plan to correct minor typographical errors.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) involving confirmation of a plan. What is at issue is whether the Debtors' Plan satisfies the "disposable income" requirement of § 1325(b)(1)(B).

## FACTS

Jason and Janice Naslund, the Debtors, are married and live in Livingston, Park County, Montana. Debtors have two dependent children, ages 4 and 15. Both Jason Naslund and Janice are employed and work in Livingston. Debtors' monthly rental expense is $545.00.

Debtors filed their Chapter 13 petition on June 9, 2006, together with their Schedules, Statement of Financial Affairs, Chapter 13 Plan, and Form B22C "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" [1]. On Schedule B, Debtors list three motor vehicles: a 1992 Ford Truck, a 1994 Jeep Cherokee and a 2002 Mercury Sable. According to Schedule B, the 1992 Ford Truck is the "Sons [sic] Vehicle Clutch Out & Not Able to Drive". Janice testified that Debtors own the 1994 Jeep free and clear of any liens, but it is not reliable. Janice also testified that Debtors may need to purchase a more reliable vehicle sometime in the future. Debtors pay a monthly payment of $133.00 to Sky Federal Credit Union for their 2002 Mercury Sable. The loan against the Mercury Sable will be paid off in approximately 39 months.[2]

Debtors' amended Schedule I filed July 26, 2006, lists their combined monthly income in the total amount of $4,417.41. Amended Schedule J lists their current monthly expenditures in the total amount of $4,137.89, leaving a monthly net income of $279.52.

On Form B22C Debtors checked the boxes on the top of the first page indicating that "Disposable income is determined under § 1325(b)(3)" and the applicable commitment period is 5 years. Debtors reported total income at Part I, Line 11 of

---

1. Official Form B22C is required by F.R.B.P. [Interim] 1007(b)(6). *See In re McGuire*, 342 B.R. 608, 610 n. 2 (Bankr.W.D.Mo.2006).

2. On Line 47 of Form B22C, Debtors represent that the total amount contractually due on the 2002 Mercury Sable, divided by 60, is $85.15. Multiplying 60 by $85.15 results in a total amount due on the automobile obligation of $5,109.00. Debtors' Schedules reflect that Debtors are making payments on their car loan of $133.00 per month. Thus, Debtors will pay off their car, and have no ownership cost associated with said vehicle, in approximately 39 months.

Form B22C as $6,183.73. At Part III "Application of § 1325(b)(3) for Determining Disposable Income", Debtors disclose at Line 21 that their annualized current monthly income of $74,204.76 exceeds the applicable median family income from Lines 16 and 22 of $52,384.00, as determined at *www.usdoj.gov/ust.*

At Line 25B of Form B22C, Debtors have also taken a deduction of $772.00 for "Local Standards: housing and utilities; mortgage/rent expense". Such amount is the appropriate allowance under the IRS Standards found at *www.usdoj.gov/ust* for a family of four living in Park County, Montana. Additionally, on Line 28a, Debtors have taken a deduction of $471.00 for the ownership costs of a first vehicle and on Line 29 of Form B22C, Debtors take a $332.00 deduction for the ownership costs associated with a second vehicle.

Debtors' total expenses at Line 38 of Form B22C are $5,391.53 as allowed under the IRS standards, and after adding additional deductions allowed under § 707(b)(2), Debtors' total expenses are stated at Line 52 as $5,714.23. Above-median debtors finalize the calculation of their disposable income under § 1325(b)(2) by completing Part V of Form B22C. Part V calculates monthly disposable income by first adding the deductions allowed under § 707(b)(2), support income and qualified retirement deductions. In this case, Debtors report monthly child support of $650.00, which amount, according to Janice, will decrease in two and one-half years when Janice's 15 year-old daughter reaches 18 years of age. The sum of the above two figures is $6,364.23, as reported on Line 57 of Form B22C. The total from

Line 57 of $6,364.23 is then subtracted from Debtor's total current monthly income of $6,183.73 as reported on Lines 20 and 53 of Form B22C, with the resulting monthly disposable income under § 1325(b)(2) stated at Line 58 of $0.00.[3]

## DISCUSSION

MBNA originally objected to confirmation of Debtors' Plan for numerous reasons, which objections could be categorized as: 1) Debtors' proposed Plan does not satisfy the requirements of 11 U.S.C. § 1325(b)(1)(B), as determined by Form B22C; and 2) Debtors' proposed Plan does not comply with 11 U.S.C. § 1325(b)(1)(B), as determined by Schedules I and J. The Chapter 13 Trustee also objected to approval of Debtors' Plan, arguing that Debtors' proposed Plan unfairly discriminates among creditors in a class in that Debtors propose to pay Janice's mother and their student loans directly and in an unimpaired fashion with no reasonable basis for such disparate treatment; and that Debtors' Plan has been proposed in bad faith as indicated by their continued payments to Janice's mother and continued payments to Wells Fargo on a certificate of deposit, which is not reasonably necessary for the maintenance of the Debtors' home. The Trustee filed a supplemental objection on July 27, 2006, arguing that Debtors' Plan was insufficiently funded to pay $28,170.00 as provided in paragraph 2(h).[4]

In response to the Trustee's and MBNA's objections, Debtors filed amended Schedules I and J on July 26, 2006, reducing their combined monthly income from $4,667.89 to $4,417.41[5], and increas-

---

3. The number is actually a negative $180.50.

4. In his Supplemental Objection filed July 27, 2006, the Trustee incorrectly states that Debtors' Plan "is insufficiently funded to pay

$27,170.00 as provided under paragraph 2(f)."

5. Debtor Jason Robert Naslund reduced his payroll deduction for "retirement" by $53.23, but Janice increased her deductions for medi-

ing their monthly expenses from $3,829.00 to $4,137.89. The July 26, 2006, amendments to Debtors' Schedules I and J reduced Debtors' monthly net income from $838.89 to $279.52. Debtors' counsel also conceded at the hearing that Debtors' Plan contained a mathematical error in ¶ 2(h).[6] Debtors' Plan provides at ¶ 2(h) that the "total amount distributed under paragraphs 2(f) and (g) will be $28,170.00[.]" As correctly noted by the Trustee, the total amount distributed under paragraphs 2(f) and (g) of Debtors' Plan will be $10,800 rather than $28,170.00.

Following Debtors' amendment to Schedules I and J, and following the hearing, MBNA filed a post-hearing brief, narrowing its objections to confirmation to Debtors' Plan to the following three:

1. Whether, on the B22C form, the Debtors are entitled to deduct their lower actual rent and car payments or the higher entire allowances provided by the IRS Standards;

2. Whether, on the B22C form, the Debtors are entitled to deduct $332.00 for the ownership expense of a second car when, in fact, they do not make an ownership or lease payment on a second car; and

3. Whether the Debtors' monthly plan payment should step-up by the appropriate amount upon payment in full of the secured claim on their first car.

Counsel for MBNA framed the above issues as either "B22C Issues" or in the

alternative, "Schedule I Minus Schedule J Issues". Counsel explained:

> Since the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, some Courts have chosen to look strictly to the B22C form for a determination of disposable income for purposes of plan payments, while other Courts have taken a less rigid approach, taking into consideration the projected disposable income as determined by a review of Schedules I and J.

Counsel's characterization of the issues as either Form B22C issues or Schedule I and J issues misinterprets the holdings of post-BAPCPA cases such as *In re Alexander,* 344 B.R. 742 (Bankr.E.D.N.C.2006); *In re Barr,* 341 B.R. 181 (Bankr.M.D.N.C. 2006); *In re Jass,* 340 B.R. 411 (Bankr. D.Utah 2006); and *In re Hardacre,* 338 B.R. 718 (Bankr.N.D.Tex.2006).

■ It is well established law in this Circuit that for a bankruptcy court to confirm a plan, "each of the requirements of section 1325 *must be present* and the debtor has the burden of proving that each element has been met." *In re Barnes,* 32 F.3d 405, 407 (9th Cir.1994); *In re Andrews,* 49 F.3d 1404, 1408 (9th Cir.1995); *Chinichian v. Campolongo,* 784 F.2d 1440, 1443–44 (9th Cir.1986) (citing *In re Elkind,* 11 B.R. 473, 476 (Bankr.D.Colo.1981)) (emphasis added).

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. 109–8, 119 Stat. 23 (2005),[7] the so-called disposable income test of § 1325 provided

---

cal, medical flex and retirement by $303.71, resulting in a net decrease in combined monthly income of $250.48.

6. Debtors' counsel also notes on page 2 of Debtors' "Brief in Support of Confirmation of First Amended Plan" filed August 14, 2006, that: "Paragraph 2(h) of the First Amended Plan should be amended to reflect that the

total amount distributed under paragraphs 2(f) and (g) will be at least $10,800.00."

7. Most of BAPCPA's amendments to the Bankruptcy Code became effective in cases filed after October 16, 2005. The instant case was filed on June 9, 2006, and is thus subject to the amendments made by BAPCPA.

that if a debtor proposed less than 100% payment to all creditors, and the trustee or an unsecured creditor objected, the debtors' plan could only be confirmed if it provided that all of the debtor's "projected disposable income" would be "applied to make payments under the plan." A debtor's projected disposable income was generally determined by looking to the debtor's Schedules I and J.

BAPCPA substantially modified the disposable income test of § 1325(b) in the following manner: (1) disposable income [current monthly income] is determined by the debtor's average monthly income received within the six-month period ending on the last day of the calendar month immediately preceding the date of the commencement of bankruptcy petition (*see* §§ 1325(b)(2) and 101(10A)); (2) for debtors with income above the applicable state's median income, amounts reasonably necessary to be expended are determined as Debtor's applicable monthly expense amounts specified under the IRS National and Local Standards and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses for the area in which the debtor resides on the date of filing (*see* §§ 1325(b)(3) and 707(b)(2)(A) and (B)); and (3) projected disposable income, multiplied by the applicable commitment period is the amount to be paid to unsecured creditors, § 1325(b)(4).

Congress defined the term "current monthly income" ("CMI"), as set forth in § 1325(b)(2) at § 101(10A) as the average monthly income from all sources, with some exceptions, that the debtor receives during the 6–month period ending on the last day of the calendar month immediately preceding the date of the commence-

ment of debtor's bankruptcy case. CMI excludes Social Security benefits or payments to victims of war crimes, of crimes against humanity or terrorism, and in the context of a chapter 13 bankruptcy (*see* § 101(10A)(B)), also excludes alimony, child support, foster care, and child disability payments (§ 1325(b)(2)). CMI is calculated by having all debtors complete lines 1–23 of Form B22C, with the result being listed on line 21 as the debtor's "[a]nnualized current monthly income for § 1325(b)(3)." The term "disposable income" is defined at § 1325(b)(2) and is determined differently depending on whether the debtor's income is above or below the applicable median family income as determined by the debtor's place of residence and household size. If a debtor's annualized current monthly income, as set forth on Line 21 of Form B22C, is greater than the applicable state's median income for a household of the same size, reasonably necessary expenses are calculated using the "Means Test" of § 707(b)(2)(A) and (B).[8]

The Means Test of § 707(b)(2)(A) attempts to uniformly and objectively determine reasonably necessary expenses by applying the allowable deductions under standards developed by the Internal Revenue Service. A debtor's allowable deductions are determined by having debtors complete lines 24–51 on Form B22C and then listing the resulting sum on line 52 as the "[t]otal of all deductions allowed under § 707(b)(2)". Debtors then calculate their monthly disposable income for purposes of § 1325(b)(2) by completing lines 53–58 on Form B22C.

*Hardacre, supra,* was the first case to discuss the term "projected disposable in-

---

**8.** If a debtor's annualized current monthly income is less than the state's applicable median income, the debtor is finished with Form B22C and proceeds to list income and expenses on Schedules I and J.

come" as found in 11 U.S.C. § 1325(b)(1)(B) and the term "disposable income" as found in 11 U.S.C. § 1325(b)(2). The debtor in *Hardacre* had above-median income and proposed a zero return to nonpriority unsecured creditors. In *dicta,* the Court in *Hardacre* noted the dichotomy between projected disposable income and disposable income under BAPCPA, stating:

> Section 1325(b)(1)(B)'s use of the phrase "projected disposable income" raises the question of whether the calculation of disposable income for plan purposes should be based upon the debtor's average income for the six months prior to bankruptcy, or the debtor's projected income based upon her financial circumstances on the "effective date of the plan."

*Hardacre,* 338 B.R. at 722. The court in *Hardacre* went on to discuss the potential for anomalous results when a debtor's current monthly income, as defined in 11 U.S.C. § 101(10A), is higher or lower than the income on a debtor's petition date, as reflected on Schedule I:

> The court believes that the term "projected disposable income" must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income. This conclusion is buttressed not only by the anomalous results that could occur by strictly adhering to section 101(10A)'s definition of "current monthly income," but because, taken as a whole, section 1325(b)(1) commands such a construction.

*Id.* The court's discussion of projected disposable income and disposable income in *Hardacre* related solely to the debtor's income, as set forth on lines 1–11 on Form B22C versus the debtor's reported income on Schedule I.

The court in *Jass, supra,* also discussed the issue between projected disposable income and disposable income. Although not specifically stated, the debtors' income in *Jass* was undoubtedly above-median for families similarly situated.[9] According to Form B22C, the debtors in *Jass* had average monthly income of $11,950.33. In contrast, the debtors' Schedule I showed gross monthly income of $7,987.00. In examining the issue of what happens if a debtor's financial situation worsens in proximity to the debtor's bankruptcy petition date, the court in *Jass* agreed with the *Hardacre* Court that "a debtor must propose to pay unsecured creditors the number resulting from Form B22C, unless the debtor can show that this number does not adequately represent the debtor's budget projected into the future." *Jass,* 340 B.R. at 416. The court in *Jass* reasoned that the term "projected" modifies "disposable income," such that "disposable income" relates to a debtor's historical finances while "projected disposable income" relates to a debtor's future finances. As in *Hardacre,* the court's discussion in *Jass* was focused on the income side of the disposable income equation rather than the expense side.

The case of *In re Kibbe,* 342 B.R. 411 (Bankr.D.N.H.2006), involved the exact opposite scenario from that found in *Jass.*

---

**9.** First, the debtors' yearly household income was $143,403.96 based on income they received during the six-month period before filing. Although this Court does not know the size of the debtors' family in *Jass,* the Census Bureau Median Family Income for a family of 4 living in Utah is $59,879, an amount well below the debtors' annualized current month-

ly income. Also, the *Jass* Court's statement that "[s]ection 1325(b)(2) defines 'disposable income' as 'current monthly income received by the debtor' less specific expenses detailed in Form B22C" leads this Court to the obvious conclusion that the court was looking to lines 24–52 of Form B22C as directed by § 1325(b)(3).

The debtor in *Kibbe* was underemployed for the better portion of the six month period preceding her petition date, but found a new job shortly before filing her bankruptcy petition. In *Kibbe*, the debtor's Form B22C showed CMI of $1,068.50 while Schedule I showed income of $5,057.00. The debtor's CMI was below-median, and yielded no disposable income. In contrast, the debtor's disposable income, calculated using the debtor's Schedule I income, was $5,027.00 less $2,645.00, or $2,382.00. The court in *Kibbe* rejected the debtor's argument that § 1325(b)(2) requires disposable income to be calculated using the CMI as set forth on Form B22C: "In a below median case, 'projected disposable income,' as used in section 1325(b)(1)(B), is based on a debtor's current income and expenses as reflected on Schedules I and J." The court reasoned that under any other holding "the debtor could avoid paying any money to unsecured creditors despite having the ability to do so because the debtor's actual disposable income would be irrelevant." *Id.* at 414–15. An argument exists, however, that a below-median income debtor must use the calculated current monthly income (disposable income) as defined (*see* 1325(b)(2)) less the more familiar expenses reflected on Schedule J for the maintenance or support of the debtor or a dependent, for a domestic support obligation, for certain charitable deductions, and for applicable business expenses. *See In re McGuire*, 342 B.R. 608, 611 (Bankr. W.D.Mo.2006) and *In re Risher*, 344 B.R. 833, 835 (2006).

The discussion of projected disposable income versus disposable income, as set forth in *Hardacre, Jass* and *Kibbe*, is not applicable to the instant case because in this case the Debtors' current monthly income per Form B22C of $6,183.73 is identical to the Debtors' gross monthly income as reported on Schedule I.[10] Also some courts are applying a mechanical test using current monthly income less § 707(b)(2) expenses to determine projected disposable income. *See In re Rotunda*, 2006 WL 2686749 (Bankr.N.D.N.Y.2006); *In re Guzman*, 345 B.R. 640 (Bankr. E.D.Wis.2006); *In re Alexander*, 344 B.R. 742 (Bankr.E.D.N.C.2006) and *In re Barr*, 341 B.R. 181 (Bankr.M.D.N.C.2006). Consequently, this Court will leave for another day the issue of whether "projected disposable income" must be based upon the debtor's anticipated income during the term of the plan, or an average of prepetition income as set forth on Form B22C.

■ Turning to the expense side of the disposable income equation, § 1325(b)(3) directs that if a debtor's annualized current monthly income exceeds the median family income of the applicable state for a particular family size, "[a]mounts reasonably necessary to be expended under paragraph (2) *shall* be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)". Section 1352(b)(3) imposes what a leading commentator describes as "[p]erhaps the most dramatic changes in the disposable income test" by application of the § 707(b)(2) means test to expense calculations. 8 COLLIER ON BANKRUPTCY ¶ 1325.08[5][c][i] (15th ed. rev.2006). On their Form B22C Debtors noted at Line 21 that their monthly income exceeds the applicable median family income, and their Plan proposes payments over a term of 5 years. Thus no dispute exists that

---

**10.** On Schedule I, the Debtors report gross wages, including overtime, of $3,484.50 for Debtor Jason Naslund and gross wages, including overtime, of $2,049.23, for Janice. The sum of the above two figures, plus their reported alimony, maintenance or support payments of $650.00, equals $6,183.73, the amount set forth on Form B22C.

Debtors are above-median income debtors. COLLIER explains:

> New section 1325(b)(3) provides that for debtors with current monthly income above the applicable state median income for their household size, reasonably necessary expenses are to be calculated using the means test formula in section 707(b)(2)(A) and (B) in order to determine payments to unsecured creditors.

Similarly, *In re Barr*, 341 B.R. 181, 185 (Bankr.M.D.N.C.2006) explains: "The use of 'shall' in section 1325(b)(3) is mandatory and leaves no discretion with respect to the expenses and deductions that are to be deducted in arriving at disposable income." The court found the language of § 1325(b)(3) unambiguous and enforced it according to its terms requiring that the expenses of above-median income debtors be determined under § 707(b)(2)(A) and (B). *Id.*, citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("When the language of a statute is plain, the sole function of the courts is to enforce the statute according to its terms unless the disposition required by the text is absurd"); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). This Court concurs with *Barr* and *Hardacre* that, in the instant case, the above-median income Debtors' expenses must be determined in accordance with the "means test". *Accord In re Guzman*, 345 B.R. at 642–43.

The Means Test set forth in § 707(b)[11] provides:

> (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).
>
> (2)(A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of—
>
> (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or
>
> (II) $10,000.

**11.** As expressed in recent legislative history, "[t]he heart of the [S. 256, the 'Bankruptcy Abuse Prevention and Consumer Protection Act of 2005'] consumer bankruptcy reform consists of the implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'), which is intended to ensure that debtors repay creditors the maximum they can afford." House Report No. 109–31(I), 1–2, 2005 U.S.C.C.A.N. 88, 89. This Court presumes that Congress seeks to ensure that debtors repay creditors the maximum they can afford while still affording debtors their "fresh start".

(ii) (I) The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent. Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor. Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts. In addition, the debtor's monthly expenses shall include the debtor's reasonably necessary expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence as identified under section 309 of the Family Violence Prevention and Services Act, or other applicable Federal law. The expenses included in the debtor's monthly expenses described in the preceding sentence shall be kept confidential by the court. In addition, if it is demonstrated that it is reasonable and necessary, the debtor's monthly expenses may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service.

(II) In addition, the debtor's monthly expenses may include, if applicable, the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family (including parents, grandparents, siblings, children, and grandchildren of the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case who is not a dependent) and who is unable to pay for such reasonable and necessary expenses.

(III) In addition, for a debtor eligible for chapter 13, the debtor's monthly expenses may include the actual administrative expenses of administering a chapter 13 plan for the district in which the debtor resides, up to an amount of 10 percent of the projected plan payments, as determined under schedules issued by the Executive Office for United States Trustees.

(IV) In addition, the debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $1,500 per year per child, to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are reasonable and necessary, and why such expenses are not already accounted for in the National Standards, Local Standards, or Other Necessary Expenses referred to in subclause (I).

(V) In addition, the debtor's monthly expenses may include an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing and utilities issued by the Internal Revenue Service, based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses

and demonstrates that such actual expenses are reasonable and necessary.

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.

(iv) The debtor's expenses for payment of all priority claims (including priority child support and alimony claims) shall be calculated as the total amount of debts entitled to priority, divided by 60.

(B)(i) In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

(ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide—

(I) documentation for such expense or adjustment to income; and

(II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

(iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

(iv) The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of—

(I) 25 percent of the debtor's nonpriority unsecured claims, or $6,000, whichever is greater; or

(II) $10,000.

Of the above-quoted provisions of § 707(b), § 1325(b)(3) invokes subparagraphs 707(b)(2)(A) and (B) for determining "[a]mounts reasonably necessary to be expended under § 1325(b)(2)" for above median-income debtors. Subparagraph 707(b)(2)(A) sets forth the debtors' allowable monthly expenses, and as explained in *In re McGuire*, 342 B.R. at 612:

[F]or above-median debtors, the statute breaks down allowable expenses into five general categories: (1) those that fit into the IRS' National Standards, which include food, clothing, household supplies, personal care, and miscellaneous expenses; (2) those that fit into the IRS' Local Standards, which include housing and transportation; (3) actual expenses for items categorized by the IRS as "Other Necessary Expenses," including such items as taxes, mandatory payroll deductions, health care, and telecommunications services; (4) actual expenses, without limitations, for certain other expenses specified by the Bankruptcy Code, such as care for disabled family

members and tuition; and (5) payments on secured and priority debts.

As the forgoing discussion illustrates, the Trustee's unfair discrimination objection is moot given the fact that the payments by Debtors to Janice's mother and to Well Fargo Bank on their certificate of deposit are not provided for on Form B22C and thus do not factor into the disposable income calculation under § 1325(b) and § 707(b). Also, as mentioned earlier, Debtors concede that ¶ 2(h) of their Plan should be amended to provide that $10,800.00 will be distributed under paragraphs 2(f) and (g). In addition, the Court need not address MBNA's objections stemming from Debtors' Schedules I and J.

The first objection raised by MBNA in its post-hearing brief is that Debtors are entitled, under the facts of this case, to the lesser of their actual rent and car ownership expense, or the Local and National standards for rent and car ownership expense. In this case, Debtors have a monthly rent payment of $545.00, yet claim a deduction of $772.00 on Form B22C for "mortgage/rent expense". Debtors also claim a deduction of $471.00 on Form B22C for the "ownership/lease expense" of their Mercury Sable, when Debtors' actual monthly payment is only $133.00, and the average monthly payment on said obligation determined over a period of 60 months is only $85.15.

Counsel for MBNA argues that Debtors' reliance on § 707(b) for the authority to take the full IRS Standard deduction for rent and the ownership costs of their Mercury Sable is misplaced:

MBNA asserts that the Debtors rely erroneously on [§ 707(b)] in support of their position. The statute does not indicate that the Debtors are entitled to the allowance amounts provided in the National and Local Standards; rather,

the word "applicable" limits their entitlement to their "applicable expense, clearly the actual amount of their monthly expenditure, and not the whole allowance."

The Court disagrees with MBNA's interpretation of § 707(b) and instead agrees with Debtors' interpretation that "[a]ctual monthly expenses are only considered 'for the categories specified as Other Necessary Expenses.'" The particular language at issue is found in § 707(b)(2)(A)(ii) and reads in relevant part:

The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides ...

In resolving questions of statutory interpretation, a court should begin with the language of the statute itself. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908, (2002). When the language of the statute is clear and unambiguous, the analysis should find its end there as well. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

The Court does not find any ambiguity in § 707(b)(2)(A)(ii). Debtors are entitled to: (1) their applicable monthly expense amounts specified under the National and Local Standards; *and* (2) the actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service, which would appear on Form B22C at Line 59. The term "applicable" in § 707(b)(2)(A)(ii)

clearly references the National and Local Standards that apply to a particular debtor as determined by the debtor's family size and place of residence. For instance, the Debtors' applicable monthly expense amount for housing is determined by Debtors' family size and county of residence. The U.S. House of Representatives in its committee report instructed that:

> In addition to other specified expenses [§ 707(B)(2)(A)(ii), (iii) and (iv)], the debtor's monthly expenses—exclusive of any payments for debts unless otherwise permitted—must be the applicable monthly amounts set forth in the Internal Revenue Service Financial Analysis Handbook [pt. 5.15.1] as Necessary Expenses [pt. 5.15.1.7] under the National [pt. 5.15.1.8] and Local Standards [pt. 5.15.1.9] categories and the debtor's actual monthly expenditures for items categorized as Other Necessary Expenses [pt. 5.15.1.9].

H.R.REP. No. 109–31, at 13–15. (2005).

Moreover, MBNA's reliance on the IRS Financial Analysis Handbook is not appropriate where the IRS Financial Analysis Handbook directly contradicts the expressed intent of Congress. The IRS Financial Analysis Handbook in discussing Local Standards provides in § 5.15.1.7 ¶ 4 that "[t]axpayers will be allowed the local standard or the amount actually paid, *whichever is less.*" (emphasis added). In contrast, "[t]he plain language of section 707(b)(2)(A)(ii)(I) provides that '[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amount specified under the Local Standards." *In re Fowler*, 349 B.R. 414, 418 (Bankr.D.Del. 2006). The statute contains no directive to use the Local Standards as a cap as suggested by the Financial Analysis Handbook. Official Form B22C, required by F.R.B.P. [Interim] 1007(b)(6), by design, directs the debtors to insert the "amount of the IRS Transportation Standards, Ownership Costs," without consideration of the actual ownership cost. *See also Fowler*, 349 B.R. at 418 ("The fact that Congress did not use language similar to the IRM evidences that it did not intend the Local Standards to apply as a cap."); *In re Farrar–Johnson*, 353 B.R. 224, 2006 WL 2662709 (Bankr.N.D.Ill.2006); and *In re Haley*, 354 B.R. 340, 2006 WL 2987947 (Bankr.D.N.H.2006).

Judge Eugene R. Wedoff's analysis that follows is instructive:

> [A] plain reading of the statute would allow a deduction of the amounts listed in the Local Standards even where the debtor's actual expenses are less. Thus, as with the allowances of the National Standards, even if the debtor's transportation and housing needs were actually satisfied without cost to the debtor, [section] 707(b)(2)(A)(ii)(I) would allow the debtor a deduction in the amounts specified in the IRM's Local Standards.... The ... IRM states that if the debtor makes no car payments, the ownership expense amount may not be claimed. Indeed this result follows necessarily from the IRM's treatment of the Local Standards as caps on actual expenditures: if a taxpayer has no car payments, the taxpayer obviously cannot claim a Local Standard amount intended to cap actual car payment expenses. However, since the means test treats the Local Standards not as caps but as fixed allowances, it is more reasonable to permit a debtor to claim the Local Standards ownership expense based on the number of vehicles the debtor owns or leases, rather than on the number for which the debtor makes payments. This approach reflects the reality that a car for which the debtor no longer makes payments may soon need to be replaced (so that the debtor will actually have

ownership expenses), and it avoids arbitrary distinctions between debtors who have only a few car payments left at the time of their bankruptcy filing and those who finished making their car payments just before the filing.

Hon. Eugene R. Wedoff, *Means Testing in the New World*, 79 Am. Bankr.L.J. 231, 255–57 (Spring 2006), *quoted in Fowler*, 349 B.R. at 418–19.

Based on the foregoing, under the Local Standards, Debtors are entitled to take the applicable housing and transportation allowances, without consideration of their actual expense.

Another Standard at issue in the case *sub judice* is the IRS Local Standard pertaining to the ownership of a second car. MBNA incorrectly analyzes whether the Debtors should be permitted to deduct the sum of $332.00 on Line 29 for the costs associated with owning a second vehicle, when Debtors make no payment on their second vehicle. When examining the applicability of a particular expense to a particular debtor under § 707(b)(2), the Court finds it instructive to refer to the IRS Financial Analysis Handbook for guidance. *See, e.g., McGuire*, 342 B.R. at 613 n. 15 ("legislative history of BAPCPA specifically refers to the IRS Financial Analysis Handbook as the basis for determining expenses under § 707(b). *See* H.R. Rep. 109–31(1), at 13–14 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88,99–100."); *Hardacre*, 338 B.R. at 726. The Internal Revenue Service, Financial Analysis Handbook § 15.15.1.7 ¶ (4)(B) provides for the allowance of Transportation expenses as follows:

> The transportation standards consist of nationwide figures for loan or lease payments referred to as ownership costs, and additional amounts for operating costs broken down by Census Region and Metropolitan Statistical Area. Oper-

ating costs were derived from BLS data. If a taxpayer has a car payment, the allowable ownership costs added to the allowable operating cost equals the allowable transportation expense. *If a taxpayer has no car payment only the operating cost portion of the transportation standard is used to figure the allowable transportation expense.* (emphasis added).

As discussed above, the Local Standards are not a cap, but are in fact the actual deduction. *Fowler*, 349 B.R. at 418. The Court respectfully disagrees with the decisions in *McGuire* and *Hardacre* and agrees with the decision in *Fowler*. *See Fowler*, 349 B.R. at 419–21. Debtors, therefore, are permitted under § 707(b)(2)(A)(ii)(I) to take the Local Standard deduction for ownership of a car even though Debtors have no car payment or lease payment on the second car.

The Court now considers the third issue as to whether Debtors' plan payments should be stepped-up by the appropriate amount upon payment in full of the secured claim on their first car. As discussed above, and regardless of whether Debtors pay off the car loan before the end of the plan term, Debtors still are entitled to claim the applicable allowance under § 707(b)(2)(A)(ii)(I). Debtors would not have any deduction for debt payment on a secured claim on line 47 of Form B22C, which may decrease expenses on line 52 and increase disposable income on line 58. Such a conclusion depends upon the amount by which the total adjustment to determine disposable income on line 57 is greater or less than total current monthly income on line 53. At this time the Court does not need to decide that issue and will wait until such issue comes before the Court on a request for modification or on some other basis.

## CONCLUSIONS OF LAW

1. This Court has original jurisdiction in this Chapter 13 case pursuant to 28 U.S.C. § 1334(a).

2. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) involving confirmation of a plan.

3. The Debtors have proved that the "disposable income" requirement of 11 U.S.C. § 1325(b)(1)(B) has been satisfied after application of §§ 1325(b)(2), 1325(b)(3), and §§ 707(b)(2)(A) and (B).

Therefore, the Court will enter a separate Order providing as follows:

**IT IS ORDERED** the Trustee's and MBNA America Bank, N.A.'s objections to confirmation of Debtors' First Amended Chapter 13 Plan filed July 11, 2006, are overruled; confirmation of Debtors' First Amended Chapter 13 Plan filed July 11, 2006, is denied so Debtors can correct their existing typographical errors; Debtors shall file an amended plan on or before November 27, 2006, with service of such amended plan to all creditors and interested parties, proof of which Debtors' attorney shall file with the Court; any objections to the amended plan shall be filed on or before December 4, 2006; and a hearing on Debtors' amended plan shall be heard on Tuesday, December 5, 2006, at 10:00 a.m., or as soon thereafter as counsel can be heard, in the 2ND FLOOR COURTROOM, FEDERAL BUILDING, 400 N. MAIN, BUTTE, MONTANA.