**In re Cathie M. SWAN, Debtor.**

**No. 06–50708–ASW.**

United States Bankruptcy Court, N.D. California.

April 18, 2007.

Richard T. Hilovsky, Law Offices of Richard T. Hilovsky, San Jose, CA, for Debtor.

Eva Alexandra Delateur, Office of the Chapter 13 Trustee, San Jose, CA, for Trustee.

## MEMORANDUM DECISION ON CREDITOR'S AMENDED OBJECTION TO CONFIRMATION

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is the amended objection of American Express Centurion Bank ("Creditor") to confirmation of the amended chapter 13 plan of Cathie M. Swan ("Debtor"). Creditor's objection is based on the assertion that (1) Debtor has not pledged all of her projected disposable income in support of the amended plan; (2) that Debtor (A) improperly claimed a transportation ownership expense based on the IRS Local Standard Transportation Expense Standards on Form B22C for a vehicle she owns free and clear of any liens and (B) improperly claimed a housing expense based on the IRS Local Standards for a one member household in Santa Clara County, California, although such expense exceeds Debtor's actual housing expense; and (3) that the phrase "applicable commitment period" referenced in 11 U.S.C. § 1325(b)(4) [1] requires the amended plan to have a term of sixty months.

The Chapter 13 Trustee in this case is Devin Derham–Burk ("Trustee"). Richard T. Hilovsky, Esq. of the Law Offices of

---

**1.** Unless otherwise noted, all statutory references are to Title 11, United States Code (the Bankruptcy Code), as it existed when Debtor filed the bankruptcy petition on May 1, 2006.

Richard T. Hilovsky, represents Debtor. John M. O'Donnell, Esq. of the Law Offices of John M. O'Donnell, represents Creditor.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### FACTS

The facts of this case are undisputed.

Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code on May 1, 2006. Concurrently with the filing of the petition, Debtor submitted a proposed chapter 13 plan, Statement of Financial Affairs, and Form B22C "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" ("Form B22C"). On June 1, 2006, Creditor filed an "Objection to Confirmation of Debtor's Plan". Debtor filed an amended plan on July 10, 2006 ("Plan"), and Creditor filed an amended objection on August 24, 2006 ("Objection"). The Trustee filed a Brief in Support of Confirmation of Debtor's Proposed Plan on December 15, 2006.

Debtor lives in San Jose, California. Debtor's Schedule J shows a monthly rental expense of $800. On Schedule B, Debtor lists a single automobile: a 1988 Ford Tempo with 120,000 miles. Debtor owns the Ford Tempo free and clear of any liens.

On Schedule I, Debtor lists gross monthly wages of $4,462 and net monthly income (after deductions for taxes, insurance, and union fees) of $2,958. Debtor's

total monthly expenses on Schedule J are $2,433, leaving monthly net income, according to the schedules, of $525.

On Form B22C, Debtor checked the box at the top of the first page indicating that "Disposable income is determined under § 1325(b)(3)", and the "applicable commitment period is 5 years." Debtor's current monthly income from Form B22C, line 11, is $4,965.04. Annualizing her current monthly income from Form B22C totals $59,580.48, which exceeds California's median family income of $43,107 for a family with one earner. Accordingly, Debtor is an above-median debtor and must complete the expense portion of Form B22C to determine the amount of disposable income that must be paid into her plan pursuant to 11 U.S.C. § 1325(b)(3).

On Line 25B of Form B22C, Debtor deducted $1,644 for housing using the IRS Local Standard for a one-member household in Santa Clara County, California. In addition, on Line 28 of Form B22C, Debtor deducted $471 for the Local Standard amount allowed for vehicle ownership expense. Debtor's total expenses allowed under the IRS Standards at line 38 of Form B22C are $4,905.54. As a result, Debtor's monthly disposable income according to Form B22C is $59.50.[2]

The Plan proposes payments of $525 per month for 36 months, resulting in total Plan receipts of $18,900.00. The proposed dividend to Debtor's unsecured non-priority creditors is approximately 17%.

Creditor holds two unsecured non-priority claims for unpaid credit card debt totaling $29,468.85.[3] These claims represent

---

2. $4,965.04 − $4,905.54 = $59.50.

3. According to Schedule F, Creditor holds two unsecured claims against the Debtor, one

for $17,734.74 and another for $11,734.11, each arising from a separate credit card account.

approximately 34% of the total claims against Debtor.[4]

Creditor's Objection contends that: (A) Debtor is not allowed to take the standard IRS expense deduction (IRS Local Standard for housing) when her actual rent is less than the standard; and (B) Debtor is not allowed to take an ownership deduction specified in the IRS Local Transportation Expense standards because she owns a car free and clear of liens. If Creditor is correct, and Debtor's claimed expense deductions are disallowed, then Debtor's monthly disposable income according to Form B22C would rise by $1,315.[5] In that case, Debtor's Amended Plan could not be confirmed because Debtor would not be paying all of her "projected disposable income" to unsecured creditors, and thus the Plan would violate § 1325(b)(1)(B). Debtor counters that the expense deductions are proper, and therefore the Plan satisfies the requirement that all projected disposable income be pledged to pay unsecured creditors. Finally, Creditor contends that because Debtor is an above-median debtor her "applicable commitment period" under § 1325(b)(1)(B) is sixty months, and this requires Debtor to commit to a five-year plan. Debtor responds by arguing that Creditor misunderstands the BAPCPA requirements and that her Plan satisfies the statute because she is paying significantly more than the full amount she would be required to pay over a five-year plan during the three-year term of her proposed Plan. In fact, Debtor is proposing to pay five times more under the proposed three-year Plan than she would be required to pay over five years.

II.

*ANALYSIS*

The petition was filed on May, 1, 2006, and thus all statutory amendments contained in the BAPCPA apply in this case.

**1. Whether calculation of Debtor's projected disposable income under § 1325(b)(1) requires the Court to look beyond Form B22C.**

Pursuant to § 1325(b)(1)(B), the Plan must provide "that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor ... less amounts reasonably necessary to be expended ... for the maintenance and support of the debtor or a dependent of the debtor ..." 11 U.S.C. § 1325(b)(2).

Creditor's argument in this regard is not clear. Creditor states that Debtor's Plan should not be confirmed because the debtor is not paying all of her "projected disposable income" under 11 U.S.C. § 1325(b)(1)(B). Creditor cites cases supporting the proposition that "projected disposable income" *may be* different than "disposable income." *In re Hardacre*, 338 B.R. 718, 723 (Bankr.N.D.Tex.2006); *In re Kibbe*, 342 B.R. 411, 414–15 (Bankr.D.N.H. 2006); *In re Dew*, 344 B.R. 655, 660 (Bankr.N.D.Ala.2006). Creditor fails, however, to provide this Court with any alternative basis for calculating Debtor's projected disposable income. Creditor has not alleged any facts indicating that Debt-

---

4. According to Schedule F, Debtor has total nonpriority general unsecured debt of $87,235.

5. $471 vehicle ownership expense plus $844 (difference between standard housing deduction of $1644 and Debtor's actual housing expense of $800).

or has the ability to pay more, or is likely to receive a substantial increase in income in the near future. Rather, in this case, Debtor's gross monthly income stated on Schedule I ($4,642) is less than on her statement of CMI ($4,965.04). Accordingly, Creditor's only allegations regarding Debtor's alleged failure to pledge all of her projected disposable income to payment of unsecured creditors relate to the housing and vehicle ownership expense deductions. Creditor makes no other argument that the statement of net income on Form B22C does not accurately reflect the income to be received by Debtor in the future. Therefore, the cases cited by Creditor are inapposite. The only specific objections by Creditor involve the expense deductions, which the Court, for the reasons stated *infra*, overrules in this Memorandum Decision.[6]

**2. Whether the expense deductions claimed by Debtor on Form B22C are proper.**

 Where the holder of an allowed unsecured claim objects to confirmation, a plan must pledge all projected disposable income during the "applicable commitment period." 11 U.S.C. § 1325(b)(1)(B). Disposable income is defined as current monthly income less "amounts reasonably necessary to be expended." *In re Crews*, 2007 WL 626041, *3 (Bankr.N.D.Ohio Feb.23, 2007). Debtor is an above-median income debtor, and therefore, according to § 1325(b)(3), the amounts reasonably necessary to be expended in calculating Debtor's disposable income under 1325(b)(2) "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." *In re Naslund*, 359 B.R. 781, 787 (Bankr.D.Mont.2006). Section 707(b)(2)(A)(ii)(I) states, in pertinent part:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent.

Creditor's Objection regarding Debtor's alleged failure to pledge all projected disposable income to repayment of unsecured creditors is based on two separate arguments. The first is Creditor's contention that Debtor is not entitled to take the IRS standard vehicle ownership deduction because Debtor owns her vehicle free and clear of liens. Creditor's second argument is that, because Debtor's actual housing

---

**6.** Moreover, in its Objection, Creditor adopts Debtor's net income statement from Form B22C as the starting point for its calculations of projected disposable income. Nowhere does Creditor argue that the Court should look elsewhere (like, for example, to Schedules I & J) to determine Debtor's required monthly Plan payment.

Because Creditor has not made any other specific objection to the calculation of Debtor's projected disposable income, the Court need not decide the issue of whether a departure from Form B22C is permissible under the law or warranted on the facts of this case. Courts deciding this issue have taken at least three different approaches. *See In re Miller*, 361 B.R. 224 (Bankr.N.D.Ala.2007)(holding that Form B22C is dispositive of an above-median debtor's projected disposable income); *In re Jass*, 340 B.R. 411 (Bankr.D.Utah 2006)(holding that Form B22C is not dispositive of a debtor's projected disposable income, but will receive a presumption that it reflects projected disposable income absent a showing of a substantial change in circumstances); *In re Demonica*, 345 B.R. 895, 900 (Bankr.N.D.Ill.2006)(holding that the term "projected disposable income" "must mean something other than the income computed on Form B22C.")

expense is less than the IRS local standard allowance, Debtor is only entitled to deduct her actual housing expense. Although these are presented as separate arguments, they both turn on the same issue, and that is whether the IRS Local Standards are caps on the allowable deductions, or are the fixed allowances that all above-median debtors may take when completing Form B22C. *See Crews,* 2007 WL 626041 at *3. For the reasons that follow, the Court finds that, with respect to both issues, the IRS Local Standards are not caps, but provide the actual deductions to be taken under the circumstances. Accordingly, the Court finds that Debtor's Plan does pledge all projected disposable income to payment of unsecured creditors, and Creditor's Objections on that basis are therefore overruled.

**A. Whether, on Form B22C, Debtor may deduct the vehicle ownership expense for a car owned free and clear of liens.**

■ Debtor owns her vehicle free and clear of liens. Debtor claimed a deduction for transportation ownership/lease expense of $471 on Form B22C. There is no question that this is the relevant amount of the IRS Transportation Standards, Ownership Costs deduction for a first car. The question is whether it is appropriate for Debtor, who owns her vehicle outright, and therefore currently makes no lease or finance payments on the vehicle, to take this deduction.

This issue has been thoroughly discussed in recent cases. No discernable majority view has yet emerged. This Court counts eleven opinions holding that a debtor cannot deduct an ownership expense for a vehicle owned free and clear. *Hardacre; In re McGuire,* 342 B.R. 608 (Bankr.W.D.Mo.2006); *In re Barraza,* 346 B.R. 724 (Bankr.N.D.Tex.2006); *In re Lara,* 347 B.R. 198 (Bankr.N.D.Tex.2006);

*In re Carlin,* 348 B.R. 795, (Bankr.D.Or. 2006); *In re Oliver,* 350 B.R. 294 (Bankr. W.D.Tex.2006); *In re Harris,* 353 B.R. 304 (Bankr.E.D.Okla.2006); *In re Wiggs,* 2006 WL 2246432 (Bankr.N.D.Ill. August 4, 2006); *In re Devilliers,* 358 B.R. 849 (Bankr.E.D.La.2007); *In re Slusher,* 359 B.R. 290 (Bankr.D.Nev.2007); *In re Ceasar,* 364 B.R. 257 (Bankr.W.D.La.2007). Fourteen courts have gone the other way, holding that the debtor may deduct the ownership expense for a vehicle that is not financed or leased. *In re Demonica,* 345 B.R. 895 (Bankr.N.D.Ill.2006); *In re Fowler,* 349 B.R. 414 (Bankr.D.Del.2006); *In re Hartwick,* 352 B.R. 867 (Bankr.D.Minn. 2006); *In re Grunert,* 353 B.R. 591 (Bankr. E.D.Wis.2006); *In re Haley,* 354 B.R. 340 (Bankr.D.N.H.2006); *In re Wilson,* 356 B.R. 114 (Bankr.D.Del.2006); *In re McIvor,* 2006 WL 3949172 (E.D.Mich. Nov. 15, 2006); *Naslund; In re Prince,* 2006 WL 3501281 (Bankr.M.D.N.C. Nov.30, 2006); *In re Zak,* 361 B.R. 481 (Bankr.N.D. Ohio 2007); *In re Sawdy,* 362 B.R. 898 (Bankr. E.D.Wis.2007); *Crews; In re Enright,* 2007 WL 748432 (Bankr.M.D.N.C. Mar.6, 2007); *In re Watson,* 366 B.R. 523, 2007 WL 1086582 (Bankr.D.Md. Apr.11, 2007).

This Court finds the latter line of cases more persuasive. The bankruptcy court in *Sawdy* collected the cases and analyzed the different rationales expressed by courts on both sides of this issue, setting forth six separate categories of explanations offered by the courts: (1) the "Plain Meaning" Rationale; (2) the Unfair Results Rationale; (3) the "Ownership/Liability" Distinction Rationale; (4) the Policy Rationale; (5) the Applicable vs. Actual Rationale; and (6) the Reliance on IRS Materials Rationale. *Sawdy,* 362 B.R. at 903–911. Like the *Sawdy* court, this Court finds two of those rationales particularly convincing—what the *Sawdy* court termed (1) the Applicable vs. Actual Ratio-

nale; and (2) the Reliance on IRS Materials Rationale. Both are applicable not only to this issue, but to the housing deduction issue as well. In addition to the two rationales that convinced the *Sawdy* court, this Court also finds that a separate policy rationale supports allowing the deduction. This policy rationale was touched upon, but not fully explicated, by the *Sawdy* court in its discussion of what it termed the "Unfair Results Rationale." *Sawdy*, 362 B.R. at 906. In addition to the rationales explored, in whole or in part, by the *Sawdy* court, this Court finds that a separate efficiency argument, buttressed by BAPCPA's legislative history, supports allowance of the standard deductions.

### The Applicable vs. Actual Rationale

■ This rationale arises from an examination of the language of § 707(b)(2)(a)(ii)(I). The first clause of that section states that, "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards." The clause immediately thereafter states: "and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides. . . ." The distinction made by the bankruptcy court in *Fowler*, and which this Court finds highly persuasive, is that the use of the word "applicable" in the first clause with regard to some expenses (which include both housing and transportation ownership), and the use of the word "actual" with regard to "Other Necessary Expenses", indicates Congressional intent to distinguish between the two classes of expenses, and to allow debtors to use the deductions found in the Local Standards for the first category. A debtor's actual expenses are only relevant with respect to expenses that fall into the "Other Necessary Expenses" category. *Fowler*, 349 B.R. at 418. Applied specifically to the transportation ownership expense, which clearly falls within the first clause of § 707(b)(2)(a)(ii)(I) and is set forth in the Local Standards, this interpretation leads to the conclusion that any debtor who owns a vehicle is entitled to the deduction for transportation ownership, regardless of whether or not the debtor, at the moment of plan confirmation, has an actual car payment expense.

This conclusion is consistent with an interpretation of the Local Standards, incorporated into § 707(b)(2)(a)(ii)(I), as fixed allowances, rather than caps on actual expenses. *See Crews*, 2007 WL 626041 at *3–*4. That this was the intent of Congress in enacting this bankruptcy legislation is further supported by the fact that, under the Internal Revenue Manual ("IRM"), the transportation ownership standards act as caps: "Taxpayers will be allowed the local standard or the amount actually paid, whichever is less." IRM 5.8.5.5.2. The fact that, in enacting the current version of the bankruptcy code, Congress chose not to adopt the language from the IRM "evidences that it did not intend the Local Standards to apply as a cap." *Fowler*, 349 B.R. at 418.

### The Reliance on IRS Materials Rationale

As explained in *Sawdy*, 362 B.R. at 911, many of the courts finding that a debtor who owned a vehicle free and clear of liens could not take the ownership deduction relied, to some extent, on language in the IRM and the IRS Collection Financial Standards. *See Hardacre*, 338 B.R. at 726; *McGuire*, 342 B.R. at 612–13; *Barraza*, 346 B.R. at 728; *Carlin*, 348 B.R. at 797; *Hartwick*, 352 B.R. at 869. In so doing, these courts concluded, on the basis of the language of those IRS publications, that because the IRS is clear that when

considering allowances for housing and transportation, a taxpayer may take the lower of the deduction set forth in the Local Standards or the amount actually spent, the same was true in this context. Accordingly, those courts held that the debtor was only entitled to deduct the lesser of the Local Standard deduction and the actual expense—so where the debtor had no transportation ownership expense (because the vehicle was owned free and clear), the debtor was not entitled to any deduction.

As discussed in the preceding section, the bankruptcy courts in *Fowler* and *Grunert* pointed out the flaw in this reasoning by referencing BAPCPA's legislative history. *See Fowler*, 349 B.R. at 419; *Grunert*, 353 B.R. at 594. If Congress had intended to adopt wholesale the language and intent of these IRS publications, it could have done so explicitly. Congress did not. In fact, § 707(b)(2)(a)(ii)(I) refers specifically to the National Standards and Local Standards, but "does not refer to or purport to include the numerous rules and practices specified throughout the Internal Revenue Manual." *Prince*, 2006 WL 3501281 at *2. None of the courts using the IRS publications in reaching their decisions cited any specific authority for doing so [7], but simply found it "instructive" to do so. *Hardacre*, 338 B.R. at 726. In the absence of any specific authority directing courts to apply those publications in interpreting this Code section, reference to such materials is inappropriate.

### The Unfair Results Rationale

For the sake of consistency with the discussion in prior opinions, the Court will refer to this as the Unfair Results Rationale. The debtors in *Sawdy* argued that in most cases where debtors owned the

vehicle for a long time, the vehicle had once been subject to a lien, but the lien had been paid off. Accordingly, in such cases, the debtors will own older vehicles, which are more likely to require repairs or replacement during the life of a typical chapter 13 plan. The debtors in *Sawdy* argued that it would be unfair to force them to pay the amount of the monthly ownership expense to creditors when they may, and likely will, need that amount of money in the future to repair or replace their present vehicle. *Sawdy*, 362 B.R. at 906. The *Sawdy* court ultimately found this rationale unpersuasive, interpreting it as a general argument for building an "emergency cushion" into the disposable income requirement of § 1325(b)(1)(A), for which the court found no statutory support, and which the *Sawdy* court was "reluctant" to read into the Code. *Sawdy*, 362 B.R. at 908.

This Court respectfully disagrees with this portion of the *Sawdy* court's analysis. In this Court's opinion, the argument that a debtor who owns an old car free and clear of liens almost inevitably will have to repair or replace it during the chapter 13 plan term provides strong support for allowing the standard deduction, both on the basis of the specific facts in this case, and the policy in general. Here, Debtor owns a 1988 Ford Tempo with 120,000 miles. By any reasonable assessment, there is a strong probability that the Debtor will have to obtain a replacement vehicle during the term of the Plan. The vehicle has very little value (Debtor valued the car at $1,500 on Schedule B), which likely renders any major repair an economically inefficient venture. Any type of reasonably reliable replacement will cost the Debtor several thousand dollars up front, a

---

7. Other than the assertion that statutory interpretation is "a holistic endeavor," citing *United ed Sav. Ass'n v. Timbers of Inwood Forest*

*Assoc., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). *Hardacre*, 338 B.R. at 725.

lengthy commitment on a significant monthly payment for a loan or lease, or both (in the case of a new car with money down—which may be necessary to make the monthly payments manageable for those with meager incomes and/or tight budgets). Requiring the Debtor to pay the full amount of the monthly ownership expense by disallowing the deduction would effectively foreclose the Debtor from doing any of those things—and ultimately from being able to replace the vehicle at all. If forced to pay the full amount of the vehicle ownership expense to creditors, the Debtor would not be able to amass any savings to use if the car breaks down, and would not have any monthly cash flow available to make monthly payments on a loan or lease. The Debtor could be forced to choose between making Plan payments and buying or leasing a new vehicle, and could ultimately wind up defaulting on the Plan as a result. This Court finds that such a result would be inconsistent with the fresh start policy of the Code and unfair to the Debtor. Moreover, if Debtor cannot complete her Plan, she would likely convert to chapter 7, which would result in creditors receiving less money than they would under the Plan.

### The Efficiency Rationale

Creditor responds to the Unfair Results Rationale by arguing that the Debtor could seek to modify the Plan if in fact the car does break down. The Court finds this argument unpersuasive. Considering the strong likelihood that Debtor will have to replace her 1988 Ford Tempo during the term of the Plan, requiring that the Plan be modified if and when that occurs is, in this Court's opinion, an inefficient manner of dealing with this issue. Every modification would require the Debtor to contact her attorney, have her attorney draft and file the necessary papers and serve notice on creditors. If a creditor should object, a hearing would have to be held, Debtor's counsel would have to file additional papers and appear at the hearing, and the Court would have to decide the motion. That process takes a significant amount of time, and costs a significant amount of money, in terms of attorney's fees, noticing costs, and judicial resources. All of that simply to allow Debtor to pay for a vehicle—which is, in most cases, an absolute necessity in terms of allowing a debtor to maintain employment. Going through such a procedure under these circumstances in thousands of bankruptcy cases is not what Congress intended. Allowing the standardized deduction, as the BAPCPA provides, is far more efficient.

This is consistent with BAPCPA's intent to limit the bankruptcy court's discretion in inquiring into " 'lifestyle and [disposable income] philosophy' questions that were prevalent under prior law. Instead, the court is left to review the Form B22C, which properly permits certain deductions that are greater than the debtor's actual expenses." *Grunert*, 353 B.R. at 594 (citations omitted). The legislative history of BAPCPA supports the conclusion that the IRS standards, rather than the debtor's actual expenses, are to be used on Form B22C: "The bill also makes substantial changes to chapter 13 by substituting the IRS expense standards to calculate disposable income....The formula remains inflexible and divorced from the debtor's actual circumstances." Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R.Rep. No. 109–31, pt. 1 at 553 (2005). Treating the standard deductions as fixed allowances, rather than caps on actual expenses, furthers the interests of efficiency, ease of administration, and limits the bankruptcy courts' inquiry into debtors'

individual expenditure choices, as intended by Congress.

From a policy perspective, Creditor's position would have the perverse effect of incentivizing debtors to incur large vehicle loans on the eve of filing chapter 13 and to spend the full amount of the standard vehicle ownership deduction. If a debtor who owns a vehicle free and clear is not permitted to take the ownership deduction, then debtors have every motivation to buy a new car—immediately prior to filing for bankruptcy—for which the deduction is permitted. Debtors who do so would receive the benefit of possessing a newer vehicle, rather than the old one owned free and clear. Faced with the choice of owning a new car or driving an old car and paying their unsecured creditors a few hundred additional dollars every month, while at the same time being tethered to a plan that makes no allowance for car payments, any rational debtor would choose the former. It is better policy to promote the purchase and use of lower-cost used vehicles by debtors. This is a more financially responsible choice than a policy that encourages debtors to stretch their budgets to buy more expensive new vehicles—just before filing bankruptcy—to take advantage of a deduction, where the only other practical alternative is, from the debtors' perspective, to lose the ability to fix or replace their vehicles.

**B. Whether, on Form B22C, Debtor may deduct the housing allowance provided by the IRS standards, or is limited to the actual expense.**

 Debtor's actual monthly rent payment is $800. Debtor claimed a deduction of $1,644 on Form B22C. This is the appropriate IRS Housing and Utility Local Standard for a one-member household in Santa Clara County, California. The question for decision is whether a debtor whose actual housing expense is lower than the IRS standard may nevertheless deduct the standard amount.

There are three decisions on this issue of which this Court is aware. Two hold that the debtor is entitled to take the full amount of the applicable housing deduction without consideration of the debtor's actual expense. *In re Farrar–Johnson,* 353 B.R. 224 (Bankr.N.D.Ill.2006); *In re Naslund,* 359 B.R. 781 (Bankr.D.Mont.2006). The other holds that a debtor is only entitled to claim the lesser of the IRS local standard amount or the actual housing expense. *In re Rezentes,* 368 B.R. 55, 2007 WL 988055 (Bankr.D.Haw. Apr. 2, 2007). This Court agrees with the *Farrar–Johnson* and *Naslund* decisions. The reasoning that this Court finds persuasive in reaching this conclusion is the same as that employed by numerous courts in deciding the vehicle ownership expense deduction. The Unfair Results Rationale, as it applies in this context, has not received any attention in the cases, and is worthy of further discussion.

If the Court were to accept Creditor's position and cap Debtor's housing deduction on Form B22C at her actual expense, it would have the effect of locking Debtor in to that expense for the duration of the chapter 13 Plan. Such a result would be unfair to the Debtor because it is highly unlikely that Debtor's housing expense will remain at the current level throughout the Plan term. Circumstances inevitably change. Rents generally go up. People move. If Debtor's rent were to increase by ten percent, that would amount to $80. But under Creditor's position, Debtor would be unable to find money in her budget to pay for that increase, because it would already have been pledged toward payment of unsecured creditors. That potentially would result in Debtor defaulting in her Plan payments (because she would be forced to divert funds allocated to the

Plan toward staying current on her rent) or, worse yet, being evicted from her home. If Debtor is unable to make her Plan payments, the case likely would be converted to chapter 7, and creditors would receive a lower return than they are entitled to under the Plan. None of these events are in the best interest of Debtor or the unsecured creditors.

As in the context of the car ownership expense, the response that Debtor could modify the Plan if her rent increases is unconvincing. It is possible, perhaps likely, that Debtor's rent could increase every year. Such a situation would require numerous modifications over the life of the Plan. Requiring Debtor to move to modify the Plan at every occasion of an increase in rent is inconsistent with the BAPCPA, and is terribly inefficient. Requiring the Debtor to incur hundreds of dollars of attorney's fees every time her rent goes up, for the sole purpose of allowing her to budget properly for her housing expense, cannot have been the result intended by Congress. The standardized deduction provided for in the language of the BAPCPA, as described above, is far more efficient.

As with the vehicle ownership situation, the same perverse policy implications are at play here. Acceptance of Creditor's position creates an incentive for debtors to spend the full amount of the allowable housing deduction on their housing expense. In this particular case, that amounts to more than $800 per month. Any rational person faced with the choice of living in a house that costs $1,600 per month, or one that costs $800 per month and at the same time being tethered to a plan that makes no allowance for rent increases, would likely choose the former. For the courts to promote such a choice would be irresponsible. Debtors should be given incentives to live within their means and to choose lower cost alternatives when fulfilling everyday needs such as housing and transportation. Such a policy is in the best interests of debtors and creditors, both in the long-run and in the short term. Debtors who live more frugally are less likely to default on their plans, and thus creditors will receive a greater return in the short term. In the long-run, Debtors who develop financially sound decision-making skills are more likely to repay their debts than those who live on the edge of, or beyond, their means.[8] This ap-

---

8. The recent decision of the bankruptcy court in *Rezentes*, despite its holding in favor of Creditor's position, illustrates the inefficiency of such a holding, as well as the perversity of the policy it encourages. In *Rezentes*, above-median debtors (a bus driver and school teacher with four dependent children) lived in a series of rented homes. The first cost $2,100 per month, and the second $1,800 per month. When the debtors' finances got even tighter, they moved in with the debtor-husband's parents (nine people to a three-bedroom house), where they paid only $300 per month in rent. After filing a chapter 13 petition, the debtors attempted to take the IRS local standard housing deduction for a family of six of $2,000 on Form B22C. An unsecured creditor objected to the deduction, arguing that the debtors were only entitled to deduct the lesser of the standard deduction or their actual housing expense. The bankruptcy

court adopted the creditor's position, holding that the debtors were only entitled to deduct their actual housing expense of $300. Following its holding, the *Rezentes* court included a section in its discussion entitled "Possible Solutions for the Debtors' Dilemma," wherein it acknowledged: "The irony of this case is that the debtors must make larger plan payments because they moved into a too-small home in a valiant and commendable effort to pay their creditors. If the debtors had remained in one of their prior residences, rather than reduced their housing expense in a failed attempt to keep up with their bills, the debtors could have claimed the entire local standard expense." The court then suggested that the debtors could propose a plan initially based on their actual housing expense, and then propose a modification if they moved into more expensive housing that better suits their needs. Or, the court suggested, the

proach is consistent with both the language and the intent of the BAPCPA, as explained *supra*, in connection with the discussion of the vehicle ownership deduction.

**3. Whether the term "applicable commitment period" in 1325(b) requires Debtor to commit to a sixty-month plan.**

■ Section 1325(b)(1)(B) states that a court may not confirm a plan unless it "provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). According to the Code, the "applicable commitment period" that applies to Debtor is "not less than 5 years." 11 U.S.C. § 1325(b)(4)(A)(ii). Creditor contends that Debtor's Plan may only be shorter than 5 years if Debtor pays all allowed unsecured creditors in full, pursuant to § 1325(b)(4)(B). It is undisputed that the Plan does not provide for full payment of all allowed unsecured claims. Debtor argues that the statute does not require a fixed plan term, and that, because the Plan proposes to pay, over 36 months, an amount greater than Debtor's projected disposable income multiplied by 60 months, the Plan should be confirmed as proposed.

This issue has been described as a distinction between a "monetary" requirement and a "temporal" requirement. *In re Brady*, 361 B.R. 765, 776 (Bankr.D.N.J. 2007), citing Alane A. Becket and Thomas A. Lee, III, Applicable Commitment Period: Time or Money?, 25–MAR Am. Bankr.

Inst. J. 16 (2006). Creditor espouses the view that the phrase "applicable commitment period" imposes a temporal requirement that Debtor must commit to a plan for a specific amount of time—in this case, five years. Some courts have adopted this position. *Slusher*, 359 B.R. at 300; *In re Casey*, 356 B.R. 519, 527 (Bankr. E.D.Wash.2006); *In re Cushman*, 350 B.R. 207, 212 (Bankr.D.S.C.2006); *In re Davis*, 348 B.R. 449, 458 (Bankr.E.D.Mich.2006); *Dew*, 344 B.R. at 661; *McGuire*, 342 B.R. at 615.

Debtor takes the position that "applicable commitment period" constitutes a monetary requirement such that, in order to be confirmed, Debtor's three-year Plan must provide for payment of her projected disposable income multiplied by the applicable commitment period. In this case, the relevant calculation is $59.50 projected disposable income according to Form B22C multiplied by the 60 month applicable commitment period equals $3,570. Debtor argues that the Plan satisfies the requirements of the Code, and therefore may be confirmed, because it proposes to pay $18,900 over 36 months, which is over five times more than Debtor's projected disposable income over the applicable commitment period of $3,570. Cases supporting Debtor's position include *Brady*, and *In re Fuger*, 347 B.R. 94 (Bankr.D.Utah 2006). Bankruptcy Judge Keith M. Lundin takes the same view in his chapter 13 treatise. *See* 5 Keith M. Lundin, *Chapter 13 Bankruptcy* §§ 500.1 at 500–2 (3d ed. 2006)("The applicable commitment period does not require that the debtor actually make payments for any particular period of time. Rather it is the multiplier in a

debtors could propose a plan with variable payments that would allow them to save up for a move into more appropriate (and expensive) housing. As discussed *supra*, requiring honest debtors to navigate chapter 13 in such

a manner, and to incur the additional expenses, so as to enable them to budget for appropriate housing is, *inter alia*, inefficient, unfair, contrary to the language and intent of BAPCPA, and constitutes bad policy.

formula that determines the amount of disposable income that must be paid to unsecured creditors.")

The logic of Debtor's position is straightforward. Unsecured creditors will receive more under the Plan than is required by the Code. Specifically, in this case, unsecured creditors will receive more than five times what the Code requires ($18,900 compared with $3,570), and they will receive it more quickly under Debtor's three-year Plan than they would if the Court were to adopt Creditor's position, and require a five-year plan term. This is clearly to the benefit of all creditors. The unsecured creditors are not being paid interest, so the time value of money makes the disparity between what Debtor is offering to pay under the Plan—$18,900 over three years—and what unsecured creditors would be entitled to under Creditor's position—$3,570 over five years—even greater than it appears at first blush. Debtor's position also furthers the Code's fresh start policy, allowing Debtor to fulfill the obligations imposed by the Code in a shorter amount of time, receive a discharge, and move on.

In light of the extreme monetary disparity between the two positions, it is difficult to comprehend why Creditor has taken this position. Practically speaking, Creditor must be hoping for one of two events to occur. Creditor wants the Plan term extended to five, rather than three, years because the longer time period increases the likelihood either that (1) the Plan will be modified upward; or (2) Debtor will default on the Plan and Creditor will maintain an entitlement to the full amount of its claim. In this Court's experience of over sixteen years on the bench, the former is extremely rare. Accordingly, Creditor's reason for supporting this position appears to be its hope that the Plan will fail. The Court finds such reasoning unpersuasive.

This reasoning contravenes the Code's fresh start policy. It also delays payment to other creditors, most of whom would likely prefer to receive payment over three years, rather than five. Moreover, if Debtor cannot keep up her Plan payments, she will likely convert to chapter 7—which would deprive creditors of a substantial portion of Debtor's Plan payments.

■ One court has held that the phrase "applicable commitment period" does not come into play where the debtor has no disposable income, but that, where the debtor has positive disposable income, the phrase mandates a specific plan length. *In re Alexander*, 344 B.R. 742, 751 (Bankr. E.D.N.C.2006). However, this is a distinction without a difference. Construction of the phrase "applicable commitment period" as a monetary requirement renders this distinction meaningless. The Code requires debtors to pay their projected disposable income over the applicable commitment period into the plan. Whether that amount is zero or greater than zero makes no difference, because in the end the effect is the same. Just as it makes no sense for a debtor to remain in chapter 13 where he has no disposable income and has paid his secured, administrative and priority claims in full, it likewise makes no sense for a debtor with some disposable income to remain in chapter 13 after he has paid the full amount required by the Code to his unsecured creditors. In both cases, the absurdity is having a debtor remain in chapter 13 awaiting discharge where, after a certain point, he has fulfilled all of the Code requirements and his plan payment is reduced to zero. The purpose of the Code is to provide debtors a fresh start and to ensure that creditors are paid as much as possible as soon as possible. It is not to incentivize people to remain in bankruptcy at the continued expense of their creditors, who could have received

their plan payments much earlier, and at the expense of the bankruptcy system as a whole.

Some courts adopting Creditor's position have held that the language of § 1325(b)(1)(B) "clearly indicates" that, where there is an objection to confirmation and the debtor does not propose to pay unsecured creditors in full, above-median debtors must perform a plan of reorganization for 60 months. *Cushman*, 350 B.R. at 212; *In re Schanuth*, 342 B.R. 601, 607 (Bankr.W.D.Mo.2006). However, the statute does not specify a minimum plan term. The statute merely states that, in order to be confirmed, a plan must apply all of a debtor's projected disposable income during the applicable commitment period to make payments under the plan. *Brady*, 361 B.R. at 776. Accordingly, the Plan meets the requirements of the statute in that it applies all of (in fact, much more than) Debtor's projected disposable income ($59.50) during the applicable commitment period (60 months) to make payments under the Plan.

The rationales supporting the conclusion that the "applicable commitment period" is a temporal requirement are unpersuasive to this Court. In *McGuire*, the bankruptcy court cited three reasons for its conclusion. First, it reasoned that, because the disposable income calculation on Form B22C is "merely a starting point," and is not dispositive such that a court need not confirm a plan that proposes to pay the amount reported on Form B22C, "it follows that a court is not required to confirm a plan because it proposes to pay a total sum equal to the Form B22C amount multiplied by the applicable number of months." *McGuire*, 342 B.R. at 615. This reasoning is unhelpful because, while the

Court need not reach the question of whether departure from Form B22C is permissible under the law, under the facts of this case, the amount of disposable income reported by Debtor on Form B22C in fact satisfies the requirements of the Code.[9] Therefore, the statement that a court "is not required to confirm a plan simply because the debtors propose a plan payment in the Form B22C amount," does not help answer the question of whether a court may do so when the amount of the Form B22C payment is not challenged as being too low.

The second reason cited by the *McGuire* court was that "a monetary interpretation of ACP renders § 1325(b)(4)(B) meaningless." *Id.* That section states that the applicable commitment period "may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period." The contention that this section is rendered superfluous by a monetary interpretation of "applicable commitment period" assumes that it is inherent in the Code that a debtor who pays unsecured claims in full may complete a chapter 13 plan in less than 36 months. *See Davis*, 348 B.R. at 455: "Under this interpretation of ACP, § 1325(b)(4)(B) doesn't really state anything more than that a debtor does not have to pay more than 100% on his unsecured claims." The fact that the Code specifically provides that if a debtor pays 100% of his claims with interest that the court must confirm the plan regardless of the plan's length does not mean that a debtor may not do what the Debtor's Plan does here, *i.e.*, pay the same amount to unsecured creditors that would be required over five years, in three years. Ac-

**9.** If the *McGuire* decision can be read to mean that this Court has discretion whether or not to confirm Debtor's Plan under the

circumstances, then the Court exercises its discretion to confirm the Plan for the reasons explained in this decision.

cordingly, the Court is not persuaded by this argument.

The third and final rationale used by the *McGuire* court to support its conclusion was that Congress did not express any intent to alter pre-BAPCPA practice on this issue by enacting the BAPCPA. *McGuire*, 342 B.R. at 615. Prior to BAPCPA, § 1325(b)(1)(B) required all of the debtor's projected disposable income received during the three-year period, beginning on the due date of the first payment, to be applied to the plan, and according to *McGuire*, debtors were not allowed to exit chapter 13 early unless they could establish extraordinary circumstances or creditors were paid in full. *Id.* Noting that the BAPCPA amendments in this regard only changed the phrase "the three year period" to "applicable commitment period", the *McGuire* court, following *Schanuth*, 342 B.R. at 608, discerned no clear intent on the part of Congress to alter the pre-BAPCPA practice. *Id.* The Court disagrees with *McGuire's* characterization of pre-BAPCPA law, particularly as it existed in this Circuit. Several pre-BAPCPA cases permitted debtors to payoff the plan balance and exit chapter 13 in less than 36 months without paying unsecured creditors in full. *Fuger*, 347 B.R. at 101, citing *In re Sunahara*, 326 B.R. 768 (9th Cir. BAP (Cal.) 2005)(court may approve a plan modification allowing a debtor to complete plan in fewer than 36 months without paying unsecured claims in full); *In re Richardson*, 283 B.R. 783 (Bankr. D.Kan.2002); *In re Forte*, 341 B.R. 859 (Bankr.N.D.Ill.2005); *In re Miller*, 325 B.R. 539 (Bankr.W.D.Pa.2005). Accordingly, the lack of a clearly expressed Congressional intent to alter pre-BAPCPA law on this issue is at best an ambiguous rationale, since an interpretation of "applicable commitment period" as a monetary, rather than temporal, require-

ment is not necessarily inconsistent with pre-BAPCPA law. In the Ninth Circuit where, under *Sunahara*, debtors could modify their chapter 13 plans to pay off the plan balance in less than 36 months, this rationale actually lends additional support to Debtor's position.

Some of the cases take a theoretical, but impractical approach to this issue that divorces the language of the Code from the realities of the debtor/creditor relationship. *See e.g., Slusher*, 359 B.R. at 300. There can be no question that in the vast majority of cases, creditors will be *far* better served under the monetary, rather than the temporal, approach. Creditors will be paid sooner under the monetary approach. This is of tremendous financial advantage, especially since unsecured creditors normally receive no interest on their claims. The present value of payments over three years is much greater than payment of the same amount of money spread out over five years. Plus, the risk of plan default is lower on a shorter plan—which means the creditors are much more likely to actually get paid, rather than having the debtor convert to chapter 7, in which case creditors are unlikely to receive any further payments. In sum, everyone benefits under the monetary approach in the vast majority of cases. More debtors will receive fresh starts more quickly. Creditors will be paid more money, more quickly, on their claims, and the entire bankruptcy system will be easier to administer and much more efficient.

This Court agrees with the *Fuger* court that "where the debtor's projected disposable income is consistent with the calculations on Form B22C, it makes little sense to hold the debtor hostage for 60 months where the debtor can satisfy the requirements of § 1325(b)(1)(B) in a shorter period." *Fuger*, 347 B.R. at 101. Accordingly, the Court holds that the phrase "applicable

commitment period" does not dictate a minimum plan term, but requires only that the Debtor's projected disposable income be computed over that amount of time—at least where, as here, Debtor's Plan provides for a term of at least three years. The Court finds that the Plan proposes to pay all of Debtor's projected disposable income over the sixty-month applicable commitment period to unsecured creditors, and therefore satisfies the requirements of § 1325(b)(1)(B). Alternatively, if this Court has the discretion to confirm Debtor's three-year Plan because it pays creditors what they would receive—in fact much more than what they would receive—under a five-year plan, the Court exercises its discretion to do so for the reasons set forth in this Memorandum Decision. Creditor's objection on this basis is overruled.

### III.

### CONCLUSION

For the reasons stated herein, the Court overrules Creditor's Objection to confirmation. The Plan shall be confirmed. Counsel for Debtor is directed to submit an order conforming to this Memorandum Decision after review as to form by counsel for Creditor.